No. 19,593.

L. F. CORY, *Plaintiff*, v. SAM S. GRAYBILL, as State Live Stock Sanitary Commissioner, and THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF REPUBLIC, *Defendants*.

SYLLABUS BY THE COURT.

1. LIVE STOCK—*Diseased Cattle—Brought into State in Violation of Law —Tests—Statute and Rules of Sanitary Commission Must be Strictly Complied with.* Section 7 of chapter 312 of the Laws of 1911 provides, among other things, that the right of indemnity for animals killed by order of the live-stock sanitary commissioner, pursuant to his duty to protect the health of domestic animals of the state, shall. not extend to animals which were brought into the state from a district of another state infected with the disease on account of which the animals are killed, or which were brought into the state in disregard of any rule, regulation, or order of the live-stock sanitary commissioner. Rule 10, promulgated by the live-stock sanitary commissioner, provides that no cattle to be used for dairy purposes, or

Cory v. Graybill.

pure-bred or registered cattle to be used for breeding purposes, shall be admitted into Kansas unless accompanied by a certificate of satisfactory tuberculin test showing them to be free from tuberculosis, applied within thirty days prior to movement, by a veterinary inspector of the bureau of animal industry, or by a veterinarian whose competency and reliability are certified to by the authorities charged with the control of diseases of domestic animals in the state where the cattle originated. One copy of such certificate must be given to the owner or person in charge, one sent to the live-stock sanitary commissioner at Topeka, and one to the common carrier to attach to the way bill. *Held,* the rule must be strictly complied with. It is not sufficient that the test be applied by a veterinarian whose license to practice his profession is issued by the board charged with the control of diseases of domestic animals in the state where the cattle originate. The test must be made by a veterinarian whose competency and reliability are certified to by such board, or else by a veterinary inspector of the bureau of animal industry, and a copy of the certificate must be sent to the live-stock sanitary commissioner at Topeka before the right to indemnity attaches.

2. SAME—*When Owner of Condemned Cattle Not Entitled to Indemnity.* Twelve head of cattle belonging to the plaintiff were ordered killed by the live-stock sanitary commissioner after the tuberculin test duly applied had shown, and after the live-stock sanitary commissioner acting in good faith and pursuant to authority duly conferred had decided, that they were afflicted with tuberculosis. On post-mortem examination it was found that three of the animals were free from tuberculosis. They had been brought into the state in violation of rule 10. *Held,* the plaintiff is not entitled to indemnity.

3. SAME—*Cattle Ordered Killed—Legal Method of Appraisement.* When cattle are ordered killed by the live-stock sanitary commissioner it is his duty, acting in conjunction with the chairman of the board of county commissioners of the county in which the animals are located and the owner, to appraise them at their value at the time of the appraisement. (Laws 1911, ch. 312, § 6.) *Held,* the appraisement may be made by a deputy employed for the purpose by the live-stock sanitary commissioner. If the chairman of the board of county commissioners refuse to act the appraisement may be made by the live-stock sanitary commissioner, or his deputy, and the owner. In making the appraisement the statutory rule governs, but it does not contemplate that a condemned animal shall necessarily be appraised at the value of the carcass because diseased and because it must be slaughtered at once.

4. SAME—*Cattle Condemned and Appraised—Order on County Commissioners to Pay Percentage of Appraised Value, Conclusive.* When an animal condemned and appraised is delivered to the live-stock sanitary commissioner for slaughter he gives to the owner an order on the board of county commissioners for an amount equal to fifty per cent of the appraised value of the animal, which the board of county

commissioners is required to accept and pay. (Laws 1911, ch. 312, §§ 8, 23.) *Held,* the order is conclusive on the board of county commissioners, in the absence of fraud, collusion or similar misconduct, and in an action of mandamus to compel payment of such an order it is not open to the board of county commissioners to show that the animal came from an infected district of another state, or was admitted in violation of rule 10, or that the appraisement was excessive.

Original proceeding in mandamus. Opinion filed June 12, 1915. Writ allowed in part and denied in part.

*W. D. Vance,* and *R. E. McTaggart,* both of Belleville, for the plaintiff.

*H. H. Van Natta,* county attorney, *F. W. Sturges,* and *F. W. Sturges, jr.,* both of Concordia, for defendant board of county commissioners.

*S. M. Brewster,* attorney-general, and *S. N. Hawkes,* assistant attorney-general, for defendant Sam S. Graybill.

The opinion of the court was delivered by

BURCH, J.: The action is one of mandamus to compel the state live-stock sanitary commissioner to issue orders for sums of money to which the plaintiff claims he is entitled on account of certain cattle killed by order of the commissioner after having been tested for tuberculosis, and to compel the board of county commissioners to accept and pay such orders. The live-stock sanitary commissioner resists the action on the ground that the cattle killed were brought into the state in violation of law and of a rule duly promulgated governing the admission of cattle for dairy and breeding purposes from a foreign state. The board of county commissioners resists the action on various grounds.

The statute, so far as applicable for present purposes, and the rule referred to read as follows:

"That when any animal or animals are killed under the provisions of this act by order of the commissioner, the owner thereof shall be paid therefor such porportion of the appraised value as fixed by the appraisement hereinbefore provided for; provided, that the right of indemnity on account of animals killed by order of the commissioner under the provisions of this act shall not extend to animals killed on account of rabies, nor to the owner of animals which have been brought into the state in a diseased condition, or from a state, country, territory or district in which the disease with which the animal is infected or to which

it has been exposed exists; nor shall any animal be paid for by the state which has been brought into the state in violation of any law or quarantine regulations thereof, or the owner of which shall have violated any of the provisions of this act or disregarded any rule, regulation or order of the live-stock sanitary commissioner, nor shall any animal be paid for by the state which came into the possession of the claimant with the claimant's knowledge that such animal was diseased or was suspected of being diseased or of having been exposed to any contagious or infectious disease; nor shall any animal belonging to the United States be paid for by the state." (Laws 1911, ch. 312, § 7.)

"RULE 10. No cattle to be used for dairy purposes or pure-bred or registered cattle to be used for breeding purposes shall be admitted into Kansas unless accompanied by a certificate of satisfactory tuberculin test showing them to be free from tuberculosis, applied within thirty days prior to movement, by a veterinary inspector of the Bureau of Animal Industry or by a veterinarian whose competency and reliability are certified to by authorities charged with the control of diseases of domestic animals in the state where the cattle originate. One copy of such certificate shall be given to the owner or person in charge, one sent to the Live Stock Sanitary Commissioner at Topeka, and one to the common carrier to attach to the way-bill."

The cattle which were killed were purchased in the vicinity of Algonquin, Ill., for dairy and breeding purposes in this state. The following facts were agreed to by the parties:

"2nd. That all said animals . . . were tested for tuberculosis by the use of Pasteur's tuberculin applied subcutaneously by W. W. Welch of Elgin, Illinois, who was a graduate veterinary surgeon, holding a license to engage generally in the practice of veterinary medicine and surgery in Illinois, issued by the Board of Live-stock Commissioners of the State of Illinois, on the recommendation of the Board of Veterinary Examiners of said State, and from certificates issued by said W. W. Welch and attached to the various way-bills of the shipments in which said animals were made, such tests were shown to have been made within thirty days prior to shipment in each instance and each of said animals certified by said Welch to be free from tuberculosis. Such certificates were not made upon any form provided by or in accordance with the rules of the Board of Live-stock Commissioners of Illinois, nor was said W. W. Welch at the several dates thereof an assistant State Veterinarian of Illinois, nor did he hold any special commission to test cattle for tuberculosis, only being licensed generally as a veterinary surgeon, as above set forth.

"21st: That by an act of the Legislature of the State of Illinois in force since July 1st, 1909, the diseases of domestic animals in that state is placed under the control and supervision of a board of three members appointed by the Governor and known as The Board of Live Stock Commissioners; that by such act such Governor is also authorized to appoint a competent veterinary surgeon as State Veterinarian, who, together with

his assistants are under the direction of the above named board; that under said act only said State Veterinarian and his assistants, who are appointed with the advice and consent of said Board, have authority to act for said Board in the matter of the investigation of the existence of .communicable diseases.among domestic animals in said State, or to declare and enforce quarantines with respect thereto.

"22nd: The following rules of said Board of Live Stock Commissioners were in force during all the time concerned in this action:

"'1st: All tuberculin and mallein for the testing of cattle, horses and mules for interstate shipments must be secured through the State Veterinarian.

"'2nd: All certificates and test sheets must be made on the forms prescribed and furnished by the State Board of Live Stock Commissioners.

"'3rd: In ordering tuberculin or mallein from the State Veterinarian he must be advised of the number of cattle, horses or mules as the case may be, and into what State the shipment is to be made.

"'4th: Each lot of cattle, horses or mules, whether physically inspected, mallein or tuberculin tested must be reported. There must be five test sheets or certificates made out and forwarded to the State Veterinarian. for his approval. When the same .are returned one copy or two must be forwarded, as the .State may require, to the State Veterinarian or Chief Sanitary officer of the State into which the shipment is made; one copy to be given to the owner or person in ·charge to be attached to the railroad way-bill and one copy forwarded to the Board of Live Stock Commissioners.

"'5th: The States of Minnesota and North Dakota do not accept certificates from veterinarians in this state. Certificates or test sheets for these two states must be signed by a Bureau of Animal Industry officer.' "

From the foregoing facts it conclusively appears that the cattle were not tested by a person qualified under rule 10 of the state live-stock sanitary commissioner of this state, and no copy of the certificate of the test which was made was sent to the commissioner of this state.

The plaintiff argues that rule 10 was substantially complied with in that the veterinarian who made the test was licensed to practice by the very board whose certificate of competency and reliability is required, that the cattle were in fact tested and found to be free from tuberculosis, and that the failure to send a certificate to the live-stock sanitary commissioner of this state was entirely without prejudice. The court concurs in the live-stock sanitary commissioner's view that rule 10 ·should be strictly complied with. This done, liberality in making indemnity to owners for cattle killed to prevent the spread of disease may well be indulged, but before the state can be called upon to pay, lawful conditions imposed upon importation

should be fully met in order that the state may not become a standing buyer of the diseased stock of other states.

There are veterinarians and veterinarians.  As in other professions some members are competent and reliable and some are not, and it is not inconceivable that an unscrupulous dealer in Illinois might be able to secure without difficulty certificates of health for a herd of diseased cattle which he desired to dispose of.  The law of Illinois authorizes the governor to appoint a *competent* veterinary surgeon to be state veterinarian, thus distinguishing between veterinarians, and limits the right to investigate the existence of communicable diseases among domestic animals to a class of veterinarians.  Rule 10 of the commissioner of this state makes the same distinction.  The required certificate must be made not merely by a veterinarian, but by a veterinarian who holds a certificate of competency and reliability from the proper Illinois authorities.  The state veterinarian of Illinois and his assistants would doubtless be regarded as qualified under rule 10.  Any other veterinarian should possess a special certificate covering competency and reliability with respect to making tuberculin tests and certifying the results.

The court is not able to say that no prejudice resulted from nonobservance of rule 10.  The manner in which the laws and regulations of both Illinois and Kansas were ignored might well cast doubt on the tests made of the plaintiff's cattle.  It is not the purpose to impugn the character or motives of any one connected with these importations, but the course pursued was just that which might be adopted to accomplish an evasion. The certificates attached to the bills of lading of the plaintiff's cattle having proceeded from an unlicensed source and copies having been withheld from both the Illinois commissioner and the Kansas commissioner, they are not evidence of freedom from disease, and the plaintiff is not in a position to say that copies of these certificates would have been accepted contrary to rule 10 if they had been forwarded to the commissioner of this state.

Scientific tests of the plaintiff's cattle, twelve in number, recognized as proper and reliable, were made by a duly licensed and qualified veterinarian commissioned by the state live-stock commissioner to make inspections and tests for tuberculosis.

These tests disclosed that each animal was afflicted with tuberculosis. On reports of the tests the commissioner ordered the cattle destroyed. After appraisement they were shipped to Kansas City, Mo., and were sold and slaughtered under federal inspection. Post-mortem examinations showed that three of the animals, appraised at $365, were free from tuberculosis. The plaintiff asks for warrants for the appraised value of the healthy animals. Section 23 of the statute of 1911, quoted later in this opinion, contemplates that a post-mortem examination may sometimes disclose that a condemned animal was not afflicted with tuberculosis, and provides that in such cases the owner shall receive the full amount of the appraisement.

The difficulty is that the cattle were imported in violation of section 5 of the statute and of rule 10. The liability of the state is expressly conditioned by the statute, and the plaintiff is an owner to whom the right of indemnity from the state is expressly denied.

The cattle were not taken for public use after the analogy of eminent domain. They were destroyed for the public good under the police power. They were not destroyed until a scientific test recognized as proper and reliable and applied by a person appointed for the purpose had shown, and the live-stock sanitary commissioner, acting in good faith, pursuant to authority duly conferred had rendered his decision that they were afflicted with a contagious disease endangering the public welfare. (Laws 1911, ch. 312, § 22.) The live-stock sanitary commissioner's decision in such cases is equivalent to the judgment of a court of condemnation. No duty to make reparation to the owner existed although the character of the test and its application and the decision of the commissioner may have contained a margin of error. Absolute certainty is possible in but few mundane affairs, and the statute would have been constitutionally valid if it had contained no provision for indemnity to the owner. The state, however, undertook to assume one-half of the owner's loss in all cases and all the loss in case error should be discovered by means of a post-mortem examination. But the statute did this on condition that cattle killed should not be present in the state in violation of its laws and sanitary regulations. The plaintiff's cattle were unlawfully within the state, and the state is under no obligation to pay for their destruction.

A part of the relief asked against the board of county commissioners is that it be required to accept and pay an order issued by the live-stock sanitary commissioner and duly presented for one-half the appraised value of a registered Holstein cow named Piebe. This animal went down under the tuberculin test, was shipped and slaughtered, and upon post-mortem examination was found to be afflicted with tuberculosis. The board of county commissioners resists payment on the ground that the animal came from a district in the state of Illinois infected with tuberculosis; that the importation was made in violation of rule 10, and that the appraisement was excessive and was made on a basis contrary to the statute. These defenses are not available to the board of county commissioners.

The animal in question was only three months old when imported, and a tuberculin test was not required because the prevailing opinion was that animals of that age would not respond to the test. In the judgment of the live-stock sanitary commissioner rule 10 did not apply.

It is true that the statute denies indemnity to an owner who ships an animal into this state from a district infected with the disease on account of which the animal is killed. The court, however, has no standard by which to determine when a district of another state is infected. A few isolated cases would scarcely render a district infected. If a disease were so far epidemic as to result in the establishment of quarantine regulations the district might well be said to be infected. Between these extremes the fact of infection is a matter of opinion and judgment on the part of those experienced in such matters and depends upon many circumstances and conditions. Presumably the live-stock sanitary commissioner is qualified to determine the fact, presumably he does so before issuing an order for the payment of the appraised value of a condemned animal, and neither the board of county commissioners nor the court is authorized to substitute its judgment for his. The legislature has laid upon the live-stock sanitary commissioner the duty and the responsibility of determining the facts upon which the liability of the state to indemnify an owner depends, and in the absence of fraud, collusion, or similar misconduct on the part of an owner or of the live-stock sanitary commissioner it is a duty of the board of county commissioners on presenta-

tion of a certificate in due form to draw its warrant on the county treasurer for the amount therein stated. (Laws 1911, ch. 312, §§ 8, 23.) The legislature has invested the live-stock sanitary commissioner with very extensive powers for the protection of the health of the domestic animals of the state, and an error of judgment on his part may be quite disastrous to public or private interests, or both. But so long as he acts in good faith and within the scope of his authority his conduct can not be reviewed by the courts, and the board of county commissioners has no more standing to impeach his certificate to an owner for cattle killed by his official order than the county treasurer has to impeach the warrant which the board of county commissioners is required to draw. The result is that the evidence produced showing that the plaintiff's cattle came from an infected district in the state of Illinois can not be considered, there being no charge of fraud or the equivalent of fraud in the answer of the board of county commissioners.

Included within the proceedings preliminary to the issuance of a certificate or order to an owner for the appraised value of condemned cattle is an appraisement. The subject is governed by sections 6 and 23 of the act of 1911, which read as follows:

"SEC. 6. That whenever as in this act provided the commissioner shall direct the killing or disposition of any domestic animal or animals, it shall be the duty of the commissioner in conjunction with the chairman of the board of county commissioners of the county in which the said animals are located and the owner of the condemned animal to appraise the animal or animals to be killed, or disposed of and he shall make an inventory of the animal or animals condemned, and in fixing the value thereof the commissioner and chairman shall be governed by the value of such animal or animals at the date of appraisement; provided, that unless otherwise expressly provided only one-half of such appraised value of such animal shall be paid to the owner.

"SEC. 23. That whenever the live stock sanitary commissioner shall have decided that any domestic animal is affected with tuberculosis he shall at once proceed to appraise the same in the same manner as is hereinbefore provided for appraising animals affected with other contagious or infectious diseases. Whereupon, the owner may exercise his option to sell such diseased animal for immediate slaughter under state or federal inspection subject to a post mortem examination under the direction of the live stock sanitary commissioner, or to deliver such animal to the live stock sanitary commissioner, upon receiving from such live stock sanitary commissioner an order drawn in the owner's favor on the board of county commissioners of the county in which the animal was situated for an

Cory v. Graybill.

amount equal to fifty per cent of the appraised value of such animal. In the event of the owner choosing the latter alternative the live stock sanitary commissioner in the careful exercise of his discretion shall forthwith destroy the said animal, or sell the same for immediate slaughter, under his supervision. The net proceeds of such sale shall be paid by the live stock sanitary commissioner into the treasury of the county in which said animals were situated and shall become a part of the general fund of such county; provided, that, if the said post-mortem shall disclose that said animal was not afflicted with tuberculosis, the live stock sanitary commissioner shall draw his order in favor of the owner upon the board of county commissioners for the full appraisal value of such animal. The board of county commissioners referred to in the provisions of this section is hereby authorized and directed to accept and pay orders drawn upon it by the live stock sanitary commissioner under the provisions of this section." (Ch. 312.)

Appraisement being an incident to the carrying into effect of an order of destruction, it may be made by a person employed for the purpose by the state live-stock sanitary commissioner at the expense of the state. (§ 17.) Should the chairman of the board of county commissioners decline to act, as occurred in this case, the appraisement may be made by the live-stock sanitary commissioner, or his deputy, and the owner. In making the appraisement the rule prescribed by the statute governs, but the statute does not contemplate that a condemned animal shall necessarily be appraised at the value of the carcass because diseased and because it is to be slaughtered at once. If this were true, the alternative given the owner by section 23 would amount to nothing. In this case some of the plaintiff's cows were carrying calves and their destruction was delayed until the calves were born. The animal, Piebe, was appraised at $190. So long as the appraisement is the result of an effort made in good faith to determine the value of the condemned animal or animals at the date of the appraisement, the certificate or order issued by the live-stock sanitary commissioner is conclusive on the board of county commissioners.

A contention is made that plaintiff waived his right to an appraisement. The court finds to the contrary. There was a misunderstanding between the plaintiff and the live-stock sanitary commissioner with reference to the sale and slaughter of the animals for which no orders were given, which need not be discussed here. The plaintiff is not entitled to the orders claimed. Orders on the board of county commissioners not

having been issued, the county is not entitled to the net proceeds of the sale of the animals. The live-stock sanitary commissioner has held the money for the plaintiff, who is entitled to receive it. The net proceeds of the sale of the animal, Piebe, should be paid into the county treasury.

The writ is allowed directing the board of county commissioners to accept and pay the order for one-half the appraised value of the animal, Piebe. With respect to other matters in controversy the writ is denied. The costs are divided between the plaintiff and the board of county commissioners.

DAWSON, J., not sitting.